J-S55026-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| IN RE: ADOPTION OF M.M.M | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: M.A.M., FATHER | No. 886 WDA 2020 |

Appeal from the Order Entered July 27, 2020
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  91 of 2019

BEFORE:   BOWES, J., McCAFFERY, J., and COLINS, J.*

MEMORANDUM BY McCAFFERY, J.:                    FILED JANUARY 14, 2021

M.A.M. (Father) appeals from the order entered in the Westmoreland County Court of Common Pleas, Orphans' Court, granting the petition of A.M.K. (Mother) and her husband, T.K. (Stepfather) to involuntarily terminate Father's parental rights to M.M.M. (Child), born in August 2008.  Father argues the orphans' court erred in:  (1) permitting evidence of his criminal record;  (2) reasoning he should have filed a custody action and could have discovered Mother and Child's address;  (3) allowing the guardian ad litem to examine him "argumentatively;"  (4) allowing Child's attorney to read statements into the record;  and (5) concluding termination was proper under 23 Pa.C.S. § 2511(a)(1) and (2) and (b).  After careful review, we affirm.

The factual and procedural history of this case is essentially undisputed.  Child was born as the result of Father and Mother's relationship.  By the time

_____

* Retired Senior Judge assigned to the Superior Court.

of Child's birth, however, the relationship had ended. N.T., 7/16/20, at 13-14. For the first five years of Child's life, Mother arranged for Father to visit Child. Id. at 13-17. In "[t]he first couple of years," Father saw Child approximately once a week, but by the time she was three years old, Father had visits approximately "once every couple of weeks." Id. at 15. Mother was present for all of these visits. Id. at 15-16. Father attributed the decline of these visits to Mother's resistance, while Mother attributed it to Father's disinterest. Id. at 14-17, 77-78. Mother ended all contact between Father and Child, after a December 2013 criminal incident resulting in Father's arrest and conviction.[1] Id. at 16-23. Father has had no contact with Child since 2013, and Child expresses little recollection of Father. Id. at 46, 51, 60.

Meanwhile, Mother began a relationship Stepfather in 2014. See N.T. at 31. We note that at this time, Child was approximately six years old. Mother and Stepfather married in 2016, and Stepfather has served as the primary father figure in Child's life. Id. at 33-34, 57. Child does not ask about Father and views herself as a part of Stepfather's family, even using Stepfather's last name on paperwork and school apparel instead of her own. Id. at 31, 50-51, 55, 58.

_____

[1] Father was convicted of unlawful restraint, 18 Pa.C.S. § 2902(a)(1), in 2014. Mother's Exh. 1.

On September 6, 2019, Mother and Stepfather filed a petition requesting involuntary termination of Father's parental rights, so that Stepfather could adopt Child. The orphans' court conducted a hearing on July 16, 2020, at which Mother, Stepfather, and Father testified.

Much of the hearing focused on Mother's decision to end Child's contact with Father three years earlier, in 2013, and on the obstacles Father allegedly faced to resuming contact. Mother testified she made her decision due to Father's criminal charges and introduced, over his objection, copies of Father's criminal records. N.T. at 17-27. In addition to the 2014 conviction of unlawful restraint, Father was also convicted: (1) in 2014 of simple assault, unlawful restraint, and related offenses for a domestic violence incident involving his girlfriend; and (2) in 2015 for possession of a controlled substance and possession with intent to deliver a controlled substance. Mother's Exhs. 1-3. Mother was also concerned Father was engaged in drug use. N.T. at 22, 37, 42-43, 56-57. However, she explained she did not intend to end Child's relationship with Father permanently, and instead she anticipated Father would one day reenter Child's life. Id. at 22-27 ("[Father] was going to come out . . . get his life together . . . and then whenever that's all done, then I will hear from him again. I just quit initiating — I didn't want my daughter being around that.").

Nonetheless, Mother testified Father did not contact her or Child until an unexpected phone call in 2018. N.T. at 28-30. She explained her phone

number had remained the same since 2009. Id. at 27-28. After the phone call, Mother and Father exchanged several text messages. Id. at 35. Mother acknowledged she was resistant to communicating with Father at that time, because she did not know whether "he had gone to rehab" nor "what's going on at that point." Id. at 37. As a result, she blocked Father on her phone. Id. at 38. Whereas Father alleged he sent Mother additional text messages, Mother testified she did not receive them because she had blocked his telephone number. Id. at 37-38. In August of 2019, Mother received a text message from Father, wishing Child a happy birthday. Id. at 39. She discovered that her previous phone block had expired, and thus she blocked Father again. Id. at 39-41. Mother indicated that Father never filed for custody or took any other action to make contact with Child.[2] Id. at 38, 44-45, 51.

In contrast, Father testified to the following: he attempted to contact Mother and request visits with Child "countless times," and had been sending Mother text messages for Child on holidays and birthdays since 2014. N.T. at 80, 89, 97. Father went to Child's maternal grandmother's home "many times," but no one answered the door, and he was only able to speak to the

_____

[2] However, Mother also testified about an incident, in which an unknown juvenile contacted Child over social media, claimed to be living with Father, and stated that Father loved Child and would be coming to her chorus concert. N.T. at 51-55. The incident was very upsetting to Child. Id.

maternal grandmother one time when she happened to be outside. Id. at 84, 103-05. Father claimed he searched for "four or five" years before calling Mother on the phone in 2018. Id. at 84, 93. He reported he sent Mother occasional text messages after the phone call but received no response. Id. at 86-89. Nonetheless, Father conceded he did not take any other action to make contact with Child, such as filing for custody. Id. at 90-111.

Relevant to Father's issues on appeal, we note Child's guardian ad litem cross-examined Father on, inter alia, the issue of Child's best interests. N.T. at 107-112. Additionally, Father has another daughter, who was seven years old at the time of the termination hearing, for whom he has a custody agreement "through the court." Id. at 97.

Child did not appear at the hearing, but her attorney, Judith Ciszek, Esquire, stated she visited Child, Mother, and Stepfather at their home in November of 2019. N.T. at 114. According to the GAL, Child told GAL: she remembered Father, whom she called by his first name, from visits "when she was small;" Child did not remember Father's face; she had no feelings for Father; Stepfather has been with Child "since she was very small" and "has always been there for her, but [Father] wasn't;" and Child "wants it to be official that [Stepfather] is her father." Id. at 115-17. Father did not object to any of the statements by Child's attorney. See id. at 120.

Child's guardian ad litem (GAL), Diane Murphy, also advised the orphans' court of the following: she met Child and Mother in June of 2020,

and spoke with Child individually. N.T. at 120. Child "spoke very lovingly of her stepfather," but with respect to Father, stated, "I really don't know him at all. I don't know anything about him. I don't know that I would recognize him anywhere." Id. at 121. The GAL stated there was no "parental/child bonding" between Father and Child, and instead, Child has a bond with Stepfather. Id. The GAL additionally stated Child understood "the adoption process" and "is very desirous of being adopted by her stepfather." Id. Father likewise raised no objection to the GAL's statements. See id. at 123.

Following the hearing, the orphans' court entered the underlying decree on July 27, 2020, terminating Father's parental rights involuntarily. Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, on August 24, 2020.

Father raises eight claims for our review:

> I. Did the [orphans'] court abuse its discretion by allowing [Mother] to introduce the criminal record of [Father] where [Father] objected to their introduction on the grounds that they were not relevant?
>
> II. Did the [orphans'] court err by including in its reasoning behind the termination of [Father's] parental rights that a custody action should have been filed by [Father]?
>
> III. Did the [orphans'] court err by including [in its] reasoning behind the termination of [Father's] parental rights that it was feasible for [Father] to locate the address of [Mother] and the minor child?
>
> IV. Did the [orphans'] court abuse its discretion by allowing the guardian ad litem to examine [Father] argumentatively when [Father] objected to such question on the grounds that it was in contradiction of Pennsylvania's Rules of Evidence?

V. Did the [orphans'] court abuse its discretion by allowing the attorney for the child to read statements into the record when the declarant was not present?

VI. Did the [orphans'] court err in coming to its conclusion that [Father], for a period of at least six months immediately preceding the filing of the petition to involuntarily terminate [Father's] parental rights, had evidenced a settled purpose of relinquishing his parental claim to the minor child when [Mother] thwarted [Father's] attempt at contact?

VII. Did the [orphans'] court err in coming to its conclusion that [Father] demonstrated repeated and continued incapacity, abuse, neglect, or refusal that caused the minor child to be without essential parental care, control, or subsistence necessary for her physical or mental wellbeing and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or would not be remedied by [Father] when all attempt at contact with the minor child was thwarted by [Mother]?

VIII. Did the [orphans'] court err in coming to its conclusion that it would be in the best interests of the minor child to involuntarily terminate the rights of [Father]?

Father's Brief at 15-17.

Our standard of review in involuntarily termination matters is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. See 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the matter at bar, the orphans' court terminated Father's parental rights pursuant to subsections 2511(a)(1), (2), and (b). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Here, we analyze the court's decision to terminate pursuant to Sections 2511(a)(1) and (b), which provide as follows:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

(b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

To satisfy the requirements of Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." In re Z.S.W., 946 A.2d 726, 730 (Pa. Super. 2008). The orphans' court must then consider the parent's explanation for their abandonment of the child, in addition to any post-abandonment contact. Id. This Court has emphasized that a parent does not perform parental duties by displaying "a merely passive interest in the development of [a] child." In re B., N.M., 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). Rather,

[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while

others provide the child with his or her physical and emotional needs. . . .

Id. (citations omitted).

We first consider Father's first, fourth, and fifth issues, all of which involve evidentiary challenges.[3] In his first claim, Father contends the orphans' court committed an abuse of discretion by admitting irrelevant evidence of his criminal history. Father's Brief at 25-30. He relies on Pennsylvania Rule of Evidence 401, which provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." See Pa.R.E. 401(a)-(b). Father argues that his criminal conduct occurred in 2013, years before the instant termination proceedings began, and was of no consequence to determining whether the requirements of Section 2511(a)(1) and (2) were satisfied. Father's Brief at 27-28. He also directs our attention to Rule 403, which permits a court to exclude relevant evidence if the danger of unfair prejudice or confusing the issues outweighs its probative value. See Pa.R.E. 403. Father asserts the evidence of his criminal history prejudiced him and confused the issues by causing the court

_____

[3] These evidentiary challenges are preserved for appeal, as Father raised objections at the termination hearing. See Pa.R.E. 103(a)(1)(A)-(B) ("A party may claim error in a ruling to admit . . . evidence only [if] a party, on the record . . . makes a timely objection . . . and (2) states the specific ground, unless it was apparent from the context."); Thompson v. Thompson, 963 A.2d 474, 477 (Pa. Super. 2008) (failure to object to admission of testimony waives any challenge on appeal).

to focus on his character, rather than his attempts to contact and parent Child. Father's Brief at 28-29. Finally, Father contends that where Mother introduced this evidence for its relevance to Section 2511(b), it was not permissible for her to introduce evidence regarding Section 2511(b) without first establishing grounds for termination pursuant to Section 2511(a). Id. at 29-30.

We note "the decision of whether to admit or exclude evidence is within the sound discretion of the orphans' court. A reviewing court will not disturb these rulings absent an abuse of discretion. Discretion is abused if, inter alia, the orphans' court overrides or misapplies the law." In re A.J.R.-H., 188 A.3d 1157, 1166-67 (Pa. 2018) (citations omitted).

The orphans' court addressed the admission of Father's criminal history in its opinion as follows, in relevant part:

> The criminal record was admitted in the context of the history of [Father's] personal life, and as one of the precipitating factors that led to his absence for several years from the Child's life. In the Child's early years, Mother was the one who initiated contact between the Child and [F]ather. Mother did so in an attempt to encourage Father to recognize the joys of fatherhood. In 2011, Father and Child's contact became less frequent because Mother's efforts at maintaining the relationship faded. At the end of 2013 and in the beginning of 2014, when Father was arrested and eventually pled guilty to a felony as a result of illegal drug activity, Mother ceased contacting him altogether. From 2013 through 2017, Father did not reach out to Mother or the Child, even though Mother had the same telephone number since 2009.
>
> We agree that a parent's criminal conduct is not in and of itself a factor in considering whether a parent has performed parental duties or maintained contact with a child. However, in this case, Father's difficulties with the criminal justice system explained why Mother stopped taking the initiative to contact him and attempting to include him in the Child's life. To that extent

and for that purpose, evidence of Father's criminal record was relevant in this case and properly admissible.

Orphans' Ct. Op., 9/9/20, at 2.

We agree with the analysis of the orphans' court. Initially, while Father is correct that a court must analyze Section 2511(a) first, before considering Section 2511(b), this principle does not prevent a court from hearing evidence relevant to both subsections at the same time. Father directs our attention to no legal authority, and we are aware of none, that supports such a proposition. Additionally, Father is mistaken that Mother sought to introduce this evidence for its relevance to Section 2511(b) only. As the court observed, Mother cited Father's criminal history while explaining her relationship with Father, Father's relationship with Child, and the eventual decline of both relationships. See N.T. at 13-17. When Father objected to the presentation of his criminal history on the basis of relevance, Mother responded that the testimony was relevant to establish her reasons for ending contact between Father and Child, to address whether Father lacked parental capacity, and to show that adoption would serve Child's best interests. Id. at 17-19. The first and second of these suggested purposes relate primarily to Sections 2511(a)(1) and (2), rather than Section 2511(b).

Moreover, it was within the orphans' court discretion to conclude evidence of Father's criminal history was relevant and admissible. See In re A.J.R.-H., 188 A.3d at 1166-67. While it is true Father's criminal activity occurred years before the termination proceedings began, the evidence

explained why Mother ended Father's visits with Child, which assisted the court in understanding the reasons for Father's lack of contact, and the obstacles that may have prevented him from resuming that contact, both of which are important considerations pursuant to our case law regarding Section 2511(a)(1). See, e.g., B., N.M., 856 A.2d at 855-56 ("Where a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles[.]"). Thus, Father's first claim is meritless.

We next consider Father's fourth claim — that the orphans' court abused its discretion by permitting Child's GAL to cross-examine him "argumentatively." Father's Brief at 36-38. He directs our attention to the following exchange, regarding whether adoption by Stepfather would be in Child's best interests:

> [GAL:] Do you want what's in the best interest of [Child]?
>
> [Father:] Of course.
>
> Q. Okay. And you are sitting in court today saying being adopted into the family she's been with for many years is not in her best interest?
>
> A. I know financially it would be probably in her best interest, but I am talking about the love that I have for my child.
>
> Q. So it's about you and your love for a child that you didn't actively try to see for many, many years? [sic]

A. No, nothing is about me. It's all about her. It's just, you know — I don't really understand what you are trying to say. You are trying to say I'm being selfish or . . .

Q. What I am trying to say is a father, a biological father, and, as you say, you are professing great love for her, would move heaven and hell to see her —

[Father's counsel]: Objection. Is that a question?

[GAL]: It is. I'm getting there.

Q. — you have not done that, have you?

A. I think I have done everything I could. I just think that she was very hard to find.

N.T. at 110-11.

According to Father, this questioning ran afoul of Pennsylvania Rule of Evidence 611(a), which directs that a "court should exercise reasonable control over the mode . . . of examining witnesses" so as to make the process "effective for determining the truth," and "protect witnesses from harassment or undue embarrassment." See Pa.R.E. 611(a)(1), (3). Father complains the GAL spoke to him in a narrative, rather than query, form, in order to place her own opinions on the record and to embarrass him. Father's Brief at 37. He contends this examination prejudiced him because it caused a "deviation from the fact-finding process and obscured the [orphans'] court[']s process in determining the truth of whether" the requirements of the Adoption Act had been met. Id. at 37-38.

While the orphans' court did not rule on Father's mid-examination objection,[4] we find no abuse of discretion in the court's allowing the examination to continue. See N.T. at 110-11. Father's counsel requested clarification as to what Child's GAL was asking Father, and the GAL responded, "I'm getting there. . . . [Y]ou have not done that, [i.e., "move heaven and hell to see [Child,] have you?" Id. After reviewing the entire examination in context, we conclude there was no abuse of discretion or violation of Rule 611. See Pa.R.E. 611(a); In re A.J.R.-H., 188 A.3d at 1166-67.

Father's fifth claim is that the orphans' court abused its discretion by permitting Child's counsel to read statements, which Child allegedly made, into evidence without proper authentication. Father's Brief at 38-39. We conclude this issue is waived, as Father raised no objection at the hearing. See Pa.R.E. 103(a)(1)(A)-(B); Thompson, 963 A.2d at 477.

However, even if Father had not waived this claim, we would conclude it is meritless. This Court has explained that legal counsel may indicate a child's preferred outcome as part of a termination proceeding, and that the child's statements in that context are admissible to establish their mental state. In re B.J.Z., 207 A.3d 914, 917-20 (Pa. Super. 2019); see also In re Adoption of K.M.G., ___ A.3d ___, 2020 WL 6580616 at *12-13 (Pa. Nov.

---

[4] Father's issue is preserved for our review. See Pa.R.E. 103(a)(1)(A)-(B); Thompson, 963 A.2d at 477.

10, 2020) ("recogniz[ing] that it may be a best practice for a child's legal counsel to divulge the child's preferences," but choosing to "leave the decision of whether to place the child's preference on the record to the child's counsel based upon counsel's legal determinations in representing his client, as well as the orphans' court"). Here, Child's counsel was not simply reading Child's statements into evidence, as Father contends. Counsel was presenting Child's wishes by describing her discussion with Child. See N.T. at 114-20 (Child's counsel recounting Child's statements and concluding, "I found the child to be very cogent, had a great ability to express her thoughts, and her thoughts were [that] she wants to be adopted. [Stepfather] has been her father, and he's always been there for her, and she wants to be sure that it's official.").

We further note Child was eleven years old at the time of the hearing and would be turning twelve the following month. The GAL pointed out that after Child turned twelve, she would have to consent to being adopted, and Child "wholeheartedly agreed to that." N.T. at 121. See 23 Pa.C.S. § 2711(a)(1) ("[C]onsent to an adoption shall be required of . . . [t]he adoptee, if over 12 years of age."). As a result, it was not error for the orphans' court to consider Child's wishes. This Court has emphasized the importance of ensuring an older child consents to a proposed adoption prior to terminating parental rights. See In the Interest of D.G., ___ A.3d ___, 2020 WL 6790746 at *7 (Pa. Super. filed Nov. 19, 2020) (explaining that the child's legal counsel provided deficient representation where, among other things, he

did not argue that the child's consent was essential to effectuate an adoption). Accordingly, Father's fifth claim fails.

We now consider Father's second, third, and sixth claims, in which he challenges the orphans' court's decision to terminate his parental rights. In Father's second claim, he contends the court erred by concluding his failure to file for custody of Child was a sufficient reason to terminate. Father's Brief at 31-34. His related third claim is that the court erred in finding it was feasible for him to locate Mother's address so that he could file for custody. Id. at 35-36. In both of these claims, Father places particular emphasis on In re Adoption of C.M.W., 603 A.2d 622 (Pa. Super. 1992) ("C.M.W."), in which this Court observed that when a parent makes reasonable efforts to overcome the obstacles preventing them from performing parental duties, "a mere showing that [the] parent could conceivably have pursued legal action more promptly cannot justify termination of parental rights." See C.M.W., 603 A.2d at 625.

The orphans' court explained its decision as follows, in relevant part:

[Father] argues that the Court erred in noting [he] never filed a Complaint for Custody, asserting that such action is not mandatory in order for a parent to demonstrate support, performance of parental duties or contact with the [c]hild.

It was not and is not this Court's opinion that the filing of a Complaint for Custody was mandatory. However, the fact that [Father], a college-educated man, had some previous experience with the legal process required to seek custodial time with his Child, yet never availed himself of that process — coupled with the fact he had not acknowledged her birthday or holidays with cards or gifts for years, and never paid anything in the form of

support, although he shared custody [of] his other daughter — led to an inference that he did not desire to assume parental duties or responsibilities for [Child]. His passivity and inaction speak volumes.

[Father] argues that the Court erred in concluding that it was feasible for [him] to locate Mother's mailing address in order to file a custody action relating to the Child.

This Court did not reach its conclusion based upon a finding that it was feasible for [Father] to locate the Child in order to file a custody action. This Court's conclusion was based upon the fact that [Father] was familiar with the legal process relating to custody because he has a custody agreement with the mother of his other child, and [Father's] stated excuse for failing to act in this case was because he believed he lacked the financial resources to do so. Although the custody courts are a public service available to all parents, without regard to economic circumstances, [Father] never availed himself of the process, again leading to an inference that he did not desire to assume parental duties or responsibilities.

Father maintains he was unable to locate Mother, yet he knew where Mother's mother resided; Mother resided close by in western Pennsylvania the entire time; and presumably Father could have conducted a search through the internet or an investigator to locate her, if he sincerely desired to do so.

Finally, when Mother and her husband filed the within "Petition for Termination of Parental Rights" in September 2019, Father would have been made aware of Mother's address. He still chose to do nothing. In other words, although Father expresses love for his daughter and a desire to be her father, for several years, he did not act to achieve that result.

Orphans' Ct. Op. at 2-4.

Father mischaracterizes the reasoning of the orphans' court. The court did not state that Father's failure to file a custody action was sufficient by itself to terminate his parental rights. Instead, the court found his inaction or non-participation in the court custody system was one relevant factor. We do not

disturb the court's conclusion that Father did not make reasonable efforts to overcome the obstacles preventing him from maintaining a relationship with Child as he contends, despite Father's insistence at the hearing that "all I thought about was my daughter." See N.T. at 97. Similarly, the court was free to determine the credibility of Father's testimony that that he was unable to locate Mother for "four or five" years, despite knowing where Child's maternal grandmother lived, and despite living in the same general area as Mother, casts doubt on his assertion that he was actually looking. See id. at 84; see also In re T.S.M., 71 A.3d at 267.

Father's sixth and final claim[5] is that the orphans' court erred in terminating his parental rights under subsection 2511(a) because the court failed to acknowledge Mother thwarted his attempts to contact Child. Father's Brief at 39-41. Father once again directs our attention to his termination hearing testimony, that his lack of contact with Child was due to his inability to locate Mother and her resistance to allowing his relationship with Child to resume.[6] Id. at 40-41.

_____

[5] Father combines the sixth, seventh, and eighth claims listed in his statement of questions involved into a single claim in the argument section of his brief. But see Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued[.]").

[6] While Father's statement of questions involved articulates a subsection 2511(b) challenge to the orphans' court finding that termination of parental rights would be in Child's best interests, he does not develop any such argument in his brief. We note that even if Father had not abandoned this

Father's claim merits no relief. As indicated above, the orphans' court found Mother and Stepfather produced clear and convincing evidence in support of their petition pursuant to Section 2511(a)(1): Father evidenced a settled purpose of relinquishing his parental claim, or refused or failed to perform his parental duties, for the six months immediately preceding the filing of the petition on September 6, 2019. The record supports the court's finding. While Father began making a minimal effort to resume his relationship with Child in 2018, by calling Mother on the phone and sending her occasional text messages thereafter, we have explained that courts must not apply the six-month period in Section 2511(a)(1) mechanically, but must consider the whole history of a given case. See B., N.M., 856 A.2d at 855. In this case, Father undertook no action to contact Child for years, until his phone call in 2018. When Mother was resistant to allowing Father to reenter Child's life, and created an obstacle by blocking him on her phone, Father did not nothing to overcome the obstacle. Instead, he simply continued sending text messages that he knew, or should have known, would not reach Mother. See id. ("Parental duty requires that the parent . . . not yield to every problem . . . . A parent must . . . exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.") We further note Father only sent six text messages during the relevant six month period,

_____

claim, the record includes evidence that Child has no relationship with Father and that Child views Stepfather as her primary father figure.

- 20 -

from March 6 to September 6, 2019. See Mother's Exh. A. Thus, the court did not abuse its discretion by terminating his parental rights pursuant to Section 2511(a)(1).

As we conclude that none of Father's claims merits relief, we affirm the July 27, 2020, order involuntarily terminating his parental rights to Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/14/2021